## A11A2378. McCRARY v. MIDDLE GEORGIA MANAGEMENT SERVICES, INC.
### (726 SE2d 740)

PHIPPS, Presiding Judge.

Middle Georgia Management Services, Inc., trading as Statesboro Finance Company ("MGM"), filed suit against Brandy Morris McCrary and others, seeking to be awarded a constructive trust on all assets, including the proceeds of a life insurance policy, obtained with funds allegedly embezzled by Barbara Morris, a former employee of MGM who committed suicide after an MGM manager began inquiry of nearly $2 million of missing company funds. McCrary, the daughter of Morris and sole beneficiary of the life insurance policy, filed a counterclaim seeking damages for the wrongful death of her mother and for attorney fees.

McCrary filed a motion for summary judgment, contending that, for various reasons, MGM's claim for the imposition of a constructive

trust over the life insurance proceeds failed. MGM also filed its own motion for judgment on the pleadings or, in the alternative, for summary judgment on McCrary's counterclaim. The trial court denied McCrary's motion for summary judgment and granted MGM's motion for summary judgment. McCrary appeals the trial court's ruling on both motions. For the reasons that follow, we reverse the trial court's denial of summary judgment to McCrary and affirm the trial court's grant of summary judgment to MGM.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] "In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant."[2]

The undisputed facts showed that Morris worked for MGM for just over five years, from September 2003 until her death on December 2, 2008. MGM is a finance company, in the business of making loans, and Morris had the authority to make loans. MGM had 17 locations throughout Georgia, and Morris worked in the Statesboro office location with two other employees.

Through an audit, it had come to the attention of MGM management that more than 944 loans issued through the Statesboro office were fictitious. On December 2, 2008, an MGM regional manager traveled to the Statesboro office to investigate the findings of the audit.

The regional manager interviewed Jill Turner, the Statesboro office manager, who told him that Morris was responsible for the fictitious loans. Turner also told the regional manager that she had never done "anything about" Morris issuing the fictitious loans because Morris had told her that "she was going to kill herself if I did." At some point that day, Morris learned that MGM management had been informed of her alleged embezzlement of company funds. Morris approached the regional manager to discuss the situation, and then later asked him whether she could step outside to smoke and to make a phone call; the regional manager allowed her to do so. But Morris left the premises, drove home, and killed herself.

---

[1] OCGA § 9-11-56 (c).

[2] *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) (citation and punctuation omitted); *Norton v. Budget Rent A Car System*, 307 Ga. App. 501 (705 SE2d 305) (2010) (we review the denial of summary judgment de novo, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party).

MGM filed a complaint for, among other things, a constructive trust to be imposed on life insurance proceeds paid to McCrary, who shared them with her brother, Kasey Morris. MGM argued that because Morris

> used money stolen from [MGM] to pay premiums on the Life Insurance with the intent to defraud [MGM], and because the proceeds of the Life Insurance have been paid to [McCrary] and shared with [Kasey Morris], a constructive trust in favor of [MGM] should be impressed on all proceeds of the Life Insurance paid to [McCrary] or coming into the hands of [Kasey Morris], and [MGM] should have a judgment against [McCrary] and [Kasey Morris] in the same amount as proven at trial.

MGM claimed recovery under the theory of unjust enrichment and sought attorney fees.[3] MGM also defined itself as a creditor of Morris.

Turner later pled guilty to three counts of theft, was sentenced to serve fifteen years incarceration and thirty years on probation, and was ordered to pay restitution in the entire amount of the fictitious loans, $1,883,542.59.

1. McCrary contends that the trial court erred in denying her motion for summary judgment because Georgia law precludes the claim of a creditor from defeating a designated beneficiary to proceeds of a life insurance policy, and the fraud exception authorized by statute does not apply here. We agree.

OCGA § 33-25-11 pertinently provides:

> (a) Whenever any person residing in the state shall die leaving insurance on his or her life, such insurance shall inure exclusively to the benefit of the person for whose use and benefit such insurance is designated in the policy, and the proceeds thereof shall be exempt from the claims of creditors of the insured unless the insurance policy or a valid assignment thereof provides otherwise. Whenever the insurance, by designation or otherwise, is payable to the insured or to the insured's estate or to his or her executors, administrators, or assigns, the insurance proceeds shall become a

---

[3] The complaint also sought imposition of a constructive trust and recovery of damages under the theory of unjust enrichment from Morris's male companion (Edward Stetson), alleging that Morris transferred to him substantial funds which she had embezzled. This claim, however, is not before us, as McCrary's motion for summary judgment concerned only the proceeds from the life insurance policy.

part of the insured's estate for all purposes and shall be administered by the personal representative of the estate of the insured in accordance with the probate laws of the state in like manner as other assets of the insured's estate.

. . .

(c) The cash surrender values of life insurance policies issued upon the lives of citizens or residents of this state, upon whatever form, shall not in any case be liable to attachment, garnishment, or legal process in favor of any creditor of the person whose life is so insured unless the insurance policy was assigned to or was effected for the benefit of such creditor or unless the purchase, sale, or transfer of the policy is made with the intent to defraud creditors.

In moving for summary judgment, McCrary argued, among other things, that MGM had failed to establish that the life insurance policy premiums were paid with the allegedly embezzled funds or that she was otherwise unjustly enriched. MGM, in part, replied that "as a matter of equity, co-mingling stolen funds into a bank account from which the premiums on the policy are paid is enough to create an issue of fact on the constructive trust issue. . . ." In ruling on the motion, the trial court determined that, based on *Ambase Intl. Corp. v. Bank South*,[4] a constructive trust could be imposed on the life insurance proceeds to the benefit of MGM over McCrary under the statutory fraud exception.[5] The court then agreed with MGM's position that "an issue of fact exits [sic] over whether they can show that [Morris] in fact embezzled funds from [MGM] and whether said funds were commingled with money she used to pay the premiums on the life insurance policy."

In *Bennett v. Rosborough*,[6] the Supreme Court of Georgia held that because a statute forbade defeating the direction of the insured as to his beneficiary, a husband who took out a policy payable to his wife was protected even though he paid the premiums with money stolen from his creditors.[7] In reaching its decision, the Court stated that "[w]hether or not this ruling comports with the weight of authority in other jurisdictions does not affect this case."[8]

---

[4] 196 Ga. App. 336 (395 SE2d 904) (1990).

[5] Id. at 340 (4).

[6] 155 Ga. 265 (116 SE 788) (1923).

[7] Id.; see *Aetna Life Ins. Co. v. Weekes*, 241 Ga. 169, 173 (1) (244 SE2d 46) (1978).

[8] *Bennett*, supra.

Under current statutory law, OCGA § 33-25-11, the claim of a creditor to life insurance proceeds cannot defeat a designated beneficiary, absent fraud; and in the event of fraud, only the cash surrender value of the policy is subject to attachment, garnishment, or legal process in favor of the creditor. To the extent that the trial court relied on *Ambase*[9] for the proposition that the fraud exception could be applied to this case, it erred. At the time *Ambase* was decided in 1990, the fraud exception provided in OCGA § 33-25-11 did not apply to only the cash value of a life insurance policy, as it does today. Nothing in this Code section authorizes the imposition of a constructive trust over life insurance proceeds under the facts of this case.

The evidence showed that the life insurance policy was a term life policy, with no cash value.[10] Consequently, the fraud exception was not triggered in this case. And under the plain terms of the statute, MGM is precluded from defeating McCrary's interest, as designated beneficiary. Accordingly, as there was no issue of material fact, the undisputed facts warrant judgment as a matter of law, and the trial court erred in denying McCrary's motion for summary judgment on MGM's claims concerning an imposition of a constructive trust on the life insurance proceeds.

2. Concerning her counterclaim, McCrary contends that the trial court erred in granting MGM's motion for summary judgment because material issues of fact exist as to whether MGM breached a duty owed to Morris. We disagree.

(a) Specifically, McCrary claims that MGM breached its duty under OCGA § 34-2-10 to take reasonable actions to protect Morris's well-being. Triable issues of fact, McCrary contends, exist as to whether it was reasonably necessary for MGM,

> with full knowledge of Morris' threats of suicide, to at least attempt to: (1) ensure an adequate support system was in place before confronting Morris; (2) contact nearby family members to warn of Morris' suicidal statement; (3) contact authorities to have Morris placed in protective custody; or (4) otherwise take some sort of action to protect her well being.

---

[9] Supra.

[10] Term life insurance is defined as insurance that pays a fixed benefit to a named beneficiary upon the insured's death but is not redeemable for a cash value during the insured's life. Black's Law Dictionary, 9th Edition (2009).

McCrary asserted that "whether [MGM]'s response to Morris' situation, or lack thereof, comports with societal notions of reasonableness is inherently a jury issue."

OCGA § 34-2-10 governs, generally, an employer's duty with respect to safe employment. The statute provides:

> (a) Every employer shall furnish employment which shall be reasonably safe for the employees therein, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such an employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees.
>
> (b) Every employer and every owner of a place of employment, place of public assembly, or public building, now or hereafter constructed, shall so construct, repair, and maintain such facility as to render it reasonably safe.

This statute has been interpreted to place a duty upon an employer to provide a safe workplace.[11] Indeed, in furnishing employees with a reasonably safe place to work, an employer is held to only an "ordinary care" standard.[12] In *Cline v. McLeod*,[13] we held:

> The employer cannot reasonably be expected to be an absolute guarantor of a physically or emotionally "safe" workplace; his duty is only that of ordinary care. . . . [T]he applicable law, in imposing on the employer the duty to maintain a safe workplace, contemplates "safety" in the physical sense; that is, that the workplace be organized and maintained in such a manner as to minimize the likelihood of physical injury — not (alas!) that it be an utopian place where each employee is guaranteed optimal working conditions and kind, courteous, and supportive treatment at all times by all present.[14]

---

[11] *Smith v. Ammons*, 228 Ga. 855, 858 (188 SE2d 866) (1972) ("The fixed standard of the law that the master shall furnish a safe place for the servant to work does not impose an absolute duty to furnish a safe place, but the duty is placed upon the master to make an effort to do so.").

[12] Id.

[13] 180 Ga. App. 286 (349 SE2d 232) (1986).

[14] Id. at 293 (4) (citations omitted).

In *Cline*, we reversed a trial court's denial of summary judgment to an employer and held that no genuine issue of material fact existed as to whether the employer discharged its duty to protect two of its employees from harassment by other employees.[15] There, the evidence showed that the employer did "all that it could reasonably be expected to do" to protect the employees from allegedly harassing acts,

> short of posting guards to escort them wherever they might go at the workplace — to lunch, to the rest room, to the parking lot, as well as to their work stations — or, for that matter, to accompany them to and from work and even to remain with them in their homes, presumably stationing themselves near the telephone to intercept harassing calls.[16]

There was no allegation that Morris's physical safety was threatened during the investigation of the stolen money. The allegation is that her *emotional well-being* was put at risk of harm. Concerning MGM's duty pursuant to OCGA § 34-2-10 to protect Morris, the undisputed evidence showed that during the investigation, the regional manager made it a point to keep Morris and Turner, who had accused Morris of issuing the fictitious loans, separated from each other. There was no evidence that Morris was ever subjected to harassment or intimidation on account of the allegations by Turner; the evidence showed merely that the regional manager undertook to investigate same and to notify his supervisors. When Morris asked the regional manager for permission to smoke and to call her daughter, he let her do so. Morris then left work without permission and committed suicide at another location.

McCrary has failed to show any set of facts as would sustain a wrongful death cause of action under this statute for Morris's suicide.[17] There being no genuine issue of material fact as to whether MGM breached its duty to Morris in this respect, as a matter of law, the trial court properly granted summary judgment to MGM.[18]

(b) Nor is McCrary's contention availing, that pursuant to *Alexander v. Harnick*,[19] triable issues of fact exist as to whether MGM caused or contributed to Morris's suicide and as to whether MGM's failure to make some effort to save Morris was objectively reasonable.

---

[15] Id.
[16] Id.
[17] See id.
[18] Id.
[19] 142 Ga. App. 816 (237 SE2d 221) (1977).

"The elements of a negligence cause of action are: (1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a causal connection between the conduct and the injury; and (4) damages from the breach of duty."[20] "Negligence is not to be presumed, but is a matter for affirmative proof. In the absence of affirmative proof of negligence, we must presume performance of duty and freedom from negligence."[21] An employer owes a duty of ordinary care to his employees.[22]

> [G]uesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment. A plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough.[23]

In *Alexander*, we recognized that "[i]f the defendant's own negligence has been responsible for the plaintiff's situation, a relation has arisen which imposes a duty to make a reasonable effort to give assistance, and avoid any further harm."[24] That case involved the drowning death of a guest on a houseboat, and we held that the

> decedent's peril was not merely characterized by her being in the water, it was characterized by her being in the water without a life preserver available, a situation which a jury might find that the defendant helped to create by taking her onto the lake without the required safety equipment.[25]

The evidence did not show that MGM (despite knowing about Morris's suicidal ideation) accused Morris of embezzlement. Rather, McCrary conceded that it was Turner, Morris's office-mate, who blamed Morris for the missing money; not MGM's regional manager,

---

[20] *Lowry v. Cochran*, 305 Ga. App. 240, 246 (2) (c) (699 SE2d 325) (2010) (punctuation and footnote omitted).

[21] *Hunsucker v. Belford*, 304 Ga. App. 200, 202 (1) (695 SE2d 405) (2010) (punctuation and footnote omitted).

[22] *Clayton v. Larisey*, 190 Ga. App. 512, 512-513 (379 SE2d 789) (1989); OCGA § 34-7-20.

[23] *Hunsucker*, supra at 202-203 (1) (punctuation and footnote omitted).

[24] *Alexander*, supra at 817 (3).

[25] Id.

the person in charge that day.[26] The regional manager investigated information supplied to him by Turner, who herself later pled guilty to the theft of the money after she had previously reported that Morris was responsible for stealing the money.

The undisputed evidence showed that during the investigation of the allegedly stolen money, Morris approached the regional manager to discuss the matter, and not the other way around, as McCrary asserts in her appellate brief. Upon request, Morris was then allowed to go outside to smoke and call her daughter. McCrary's theory that MGM could have prevented Morris from killing herself (at home) if the regional manager had responded differently to the situation is pure speculation and does not create even an inference of fact for consideration on summary judgment.[27]

Because the evidence failed to show that MGM was responsible for creating a situation[28] which McCrary suggests led to Morris's suicide, MGM had no duty to make a reasonable effort to render aid for her emotional well-being and avoid any (further) harm.[29] Accordingly, we conclude that, on this ground, the trial court properly granted summary judgment to MGM.

3. McCrary contends that the trial court erred in granting MGM's motion for summary judgment because material issues of fact exist as to whether Morris's death proximately resulted from MGM's negligence. But "[n]egligence is not actionable unless it is the proximate cause of the injury."[30] Because we have determined in Division 2 that the trial court properly found that the evidence failed to show

---

[26] McCrary argues that Turner's act of accusing Morris should be attributed to MGM since Turner was an office manager. We disagree. See *Roberts v. Duco Dev.*, 229 Ga. App. 549, 550 (494 SE2d 313) (1997) ("In determining whether an employer is liable for an employee's tortious conduct, the test is whether the tort was done within the range of employment and for the purpose of accomplishing business authorized by the employer. Where the tort of an employee is wholly personal to himself, it is not within the scope of his employment and the master is not liable.") (citations omitted); *Leo v. Waffle House*, 298 Ga. App. 838, 842 (3) (681 SE2d 258) (2009) ("The question of whether the servant at the time of an injury to another was acting in the prosecution of his master's business and in the scope of his employment is for determination by the jury, except in plain and indisputable cases.") (punctuation and footnote omitted). As evidenced by Turner's plea of guilty to criminal charges for theft of the money, Turner's act of accusing Morris was clearly committed for purely personal reasons unconnected with her job. Thus, contrary to McCrary's assertions, MGM is not liable for Turner's actions in this regard.

[27] See *Hunsucker*, supra; *Tuggle v. Helms*, 231 Ga. App. 899, 902-903 (2) (499 SE2d 365) (1998).

[28] See *La Quinta Inns v. Leech*, 289 Ga. App. 812, 817 (1) (658 SE2d 637) (2008); *Alexander*, supra.

[29] See *Alexander*, supra; *Gale v. North Meadow Assoc. Joint Venture*, 219 Ga. App. 801, 803 (466 SE2d 648) (1995) (physical precedent only).

[30] *Johnson v. American Nat. Red Cross*, 276 Ga. 270, 273 (1) (578 SE2d 106) (2003) (citation and punctuation omitted); *Dry Storage Corp. v. Piscopo*, 249 Ga. App. 898, 900 (550 SE2d 419) (2001) (punctuation and footnote omitted).

that MGM committed any negligent act, we need not address any issues of proximate cause here.[31]

*Judgment affirmed in part and reversed in part. Andrews and McFadden, JJ., concur.*

DECIDED MARCH 28, 2012.

*Coleman Talley, Gregory T. Talley, Alphonso A. Howell IV*, for appellant.

*Bullard & Wangerin, Daniel Bullard IV, Erin S. Corbett, Hall & Kirkland, Joseph M. Hall, Brown, Rountree & Stewart, George H. Rountree, Jesse A. VanSant, Edenfield, Cox, Bruce & Classens, Gerald M. Edenfield*, for appellee.